Gregory B. Collins (#023158)
Daniel P. Crane (#030623)
KERCSMAR FELTUS & COLLINS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kfcfirm.com
dpc@kfcfirm.com

Daniel C.F. Wucherer (Ohio Bar No. 0097210) (*pro hac*)
VORYS, SATER, SEYMOUR AND PEASE LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, Ohio 45202
Direct: 513.723.4093
Fax: 513.582.7811
dcwucherer@vorys.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Isagenix International, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Oliver Marshak, an individual, Marshak Enterprises, LLC, a Wyoming limited liability company, Aharon Hopstein a/k/a Ari Hopstein, an individual, and The Well Nutrition Inc., a New York corporation,<br><br>Defendants. | Case No. 2:22-cv-00282-ESW<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR BREACH OF CONTRACT AND FRAUD**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Isagenix International, LLC ("Plaintiff" or "Isagenix") brings this action against Defendants Oliver Marshak, Marshak Enterprises LLC, Aharon Hopstein a/k/a Ari Hopstein, and The Well Nutrition Inc. (collectively, "Defendants") for breach of

contract and fraud. Defendants entered into contracts with Isagenix that, among other things, gave Defendants the right to purchase Isagenix products from Isagenix in exchange for Defendants' agreement to sell the products only to end-user consumers, not sell products on any unauthorized website, and not sell products to any third party that resells the products on the Internet. Defendants also entered into additional contracts that allowed Defendants to purchase high volumes of products from Isagenix at a reduced cost. Before entering into the additional contracts, Defendants assured Isagenix that they were complying with the terms in their contracts and would not sell products on unauthorized websites or to any third party that resells the products. Defendants also repeated these assurances upon entering into the additional contracts. Through third party discovery, however, Isagenix has discovered that these representations were lies and that Defendants have repeatedly breached their contracts by selling Isagenix products to Amazon.com, Inc., the operator of the online marketplace located at www.amazon.com. In further support of its complaint, Isagenix alleges as follows.

## PARTIES, JURISDICTION, AND VENUE

1. Isagenix is an Arizona limited liability company with its principal place of business located in Gilbert, Arizona.

2. Oliver Marshak ("Marshak") is a natural person who, upon information and belief, resides at 301 S. Las Palmas Ave., Los Angeles, CA 90020 and may be served with process therein or wherever he may be found.

3. Marshak Enterprises, LLC is a limited liability company organized under the laws of the State of Wyoming. According to corporate documents filed with the Wyoming Secretary of State, the principal office address of Marshak Enterprises, LLC is located at 1712 Pioneer Avenue, Ste. 1915, Cheyenne, WY 82001. Corporate documents also provide that the registered agent of Marshal Enterprises, LLC is Capital Administrations, LLC, located at 1712 Pioneer Ave., Ste. 1915. Upon information and belief, Marshak is the sole managing member of Marshak Enterprises LLC, in control of

Marshak Enterprises LLC, and the moving force behind the actions of Marshak Enterprises, LLC.

4. Aharon Hopstein a/k/a Ari Hopstein ("Hopstein") is a natural person who, upon information and belief, resides at 58 Pomona Road, Suffern, NY 10901 and may be served with process therein or wherever he may be found.

5. The Well Nutrition Inc. ("Well Nutrition") is a corporation organized under the laws of the State of New York. Upon information and belief and according to corporate documents filed with the New York Department of State, the principal place of business of Well Nutrition is located at 59 NY-59, Monsey, NY 10952. Upon information and belief, Hopstein is the sole director and officer of Well Nutrition, in control of Well Nutrition, and the moving force behind the actions of Well Nutrition.

6. This Court has subject matter jurisdiction over Isagenix's claims pursuant to diversity jurisdiction, 28 U.S.C. § 1332(a), because Isagenix is a citizen of Arizona, Defendants are citizens of New York, California, and Wyoming, and the amount in controversy exceeds $75,000.

7. This Court has personal jurisdiction over Defendants because they breached bulk volume purchase contracts with Arizona-resident Isagenix that are governed by Arizona law and provide that any legal action arising out of or related to the contracts must be instituted in the state and federal courts within Arizona and Maricopa County and that the parties consent to such jurisdiction and venue. Defendants also made fraudulent representations to Isagenix in Arizona and purchased thousands of products from Isagenix in Arizona that relate and give rise to Isagenix's claims for breach of contract and fraud.

8. Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because of the forum selection clause in the parties' contracts and because a substantial part of the events giving rise to Isagenix's claims herein occurred within this judicial district.

**FACTUAL ALLEGATIONS**

**Isagenix and Its Contracts with Isagenix Independent Associates**

9. Isagenix develops, manufactures, and sells nutrition, weight-management, energy and fitness, and personal care products (referenced hereinafter as "Isagenix products").

10. Isagenix products are sold by independent contractors known as Isagenix Independent Associates ("Associates").

11. Associates must enter into contracts with Isagenix to be permitted to sell Isagenix products. These contracts ("Associate Contracts") consist of the terms and conditions in the Isagenix Independent Associate Application and Agreement, the Isagenix Policies & Procedures, and additional materials.

12. Associates receive substantial benefits under their Associate Contracts with Isagenix, including the right to purchase Isagenix products at reduced cost for resale, the right to sponsor customers and other applicants to become Associates, the right to receive compensation and qualify for bonuses under the Isagenix Team Compensation Plan, and a variety of support for themselves and their customers.

13. Associate Contracts also require Associates to comply with various rules and restrictions (the "Isagenix Rules").

14. Some of the Isagenix Rules require Associates to carry out quality controls over Isagenix products, to ensure that customers receive Isagenix products from Associates that are of premium quality. For example, Associates are required to sell Isagenix products in their original containers and packaging and are prohibited from altering Isagenix products, their labels, or accompanying literature and other materials in any way. Associates also have access to resources developed by Isagenix that they use to provide personal services to consumers before, during, and after product sales, including advising consumers about product information and best practices for safe and optimal use of Isagenix products.

15. The Isagenix Rules also restrict the manner and channels through which Associates may sell Isagenix products. For example, to optimize customers' experiences with Isagenix products and ensure that Associates do not sell products through channels

in which consumers may not know whether they are purchasing from an Associate, the Isagenix Rules expressly prohibit Associates from selling Isagenix products through any website or other online medium except for personal "Associate websites" provided to Associates by Isagenix or approved personal, independent websites. Associates are specifically prohibited from selling products through online marketplace websites such as www.ebay.com ("eBay") and www.amazon.com ("Amazon"). If Associates sell Isagenix products through any unauthorized website, their Associate Contracts provide that they must pay $500 to Isagenix for each unit of product they sold.

16. The Isagenix Rules also provide that Associates may purchase products from Isagenix only for Associates' own personal use or to resell to end-user consumers. Associates are prohibited from selling Isagenix products to any third party that resells the products through the Internet. Unless they receive Isagenix's prior written consent, Associates are also prohibited from selling to a third party any quantity of Isagenix products that is greater than the quantity generally purchased by a consumer for personal use by the consumer's immediate household.

17. If Associates sell Isagenix products to third parties and knew or should have known that the third parties purchased the products for the purpose of reselling them through the Internet, Isagenix's Associate Contracts provide that the Associates must pay $500 to Isagenix for each unit of product they sold to the third party.

18. Isagenix allows Associates to sell products only to end-user consumers, and only in quantities that are generally consumed by consumers for personal use, to prevent Isagenix products from being sold to consumers by unauthorized sellers who are outside of Isagenix's quality controls and over whom Isagenix cannot exercise quality control.

19. Isagenix's prohibition of Associates' sales through unauthorized websites and its prohibition of Associates' sales to third parties who resell the products on the Internet both expressly remain in force even if the Associate Contract between Isagenix and an Associate is terminated.

**Defendants' Breach of Contract and Fraud**

20. On or around July 6, 2017, Marshak entered into an Associate Contract with Isagenix by agreeing to the terms in the Isagenix Independent Associate Application and Agreement. In entering into the contract, Marshak agreed to follow the Isagenix Rules and abide by all of the terms in the Isagenix Policies & Procedures, among other terms.

21. In or around September 2021, Marshak contacted Isagenix and explained that he was interested in entering into an arrangement in which he would be permitted to purchase a very high volume of Isagenix products at a discounted price.

22. Isagenix investigated Marshak's purchase history and discovered that Marshak had been purchasing a high volume of Isagenix products and directing that they be shipped to an address in New York, even though Marshak had represented to Isagenix that he lives in California.

23. Isagenix questioned Marshak about his purchases and Marshak explained that he was having products shipped to Hopstein, Marshak's friend who resides in New York. Marshak explained that Hopstein was able to sell a very high volume of Isagenix products because he had a large base of customers that he managed through an email database. Isagenix also discovered that many of the purchases Marshak was making from Isagenix were with a credit card that was in Hopstein's name.

24. Isagenix employee Nancy Martinez spoke with Marshak by phone on September 30, 2021. During the call, Ms. Martinez explained that Isagenix was suspicious the products Marshak and Hopstein were purchasing were actually being sold on Amazon, in violation of the Isagenix Rules, instead of to end-user consumers through non-Internet transactions. Marshak assured Ms. Martinez that the products were not being sold on Amazon.

25. In the following few months, Marshak continued to communicate with Isagenix and asked if he could enter into an agreement that would permit him to purchase a very high volume of Isagenix products at a discounted price (a "Bulk Volume Purchase

Agreement"). Hopstein also began communicating with Isagenix and asked if he too could enter into a Bulk Volume Purchase Agreement.

26. Isagenix was hesitant to enter into Bulk Volume Purchase Agreements because of its suspicion that the products Marshak and Hopstein were purchasing were actually being sold on unauthorized Internet websites. As a result, multiple Isagenix employees questioned Marshak and Hopstein about why they wished to enter into Bulk Volume Purchase Agreements and reiterated that Marshak and Hopstein would be in material breach of their contracts with Isagenix—and required to pay $500 to Isagenix for each unit of product they sold—if they sold products on unauthorized websites or to a third party they knew would resell the products on the Internet.

27. During these conversations, Marshak and Hopstein repeatedly stated that the products they were purchasing were not being sold on Amazon or any other website. For example, on a videoconference call that occurred or around January 14, 2022, Hopstein told Isagenix employees Cassy Readette and Kal Elampooranar that he sold Isagenix products through multiple juice and vitamin shops he owned in New York. Hopstein and Marshak stated that the products they were purchasing were not being sold on Amazon and that they understood the Isagenix Rules prohibit sales on Amazon or to any third party that sells the products on Amazon or any other website.

28. Because of Marshak and Hopstein's assurances that they were not selling and would not sell Isagenix products on unauthorized websites or to any third party that would resell the products on the Internet, Isagenix ultimately agreed to enter into Bulk Volume Purchase Agreements. On January 25, 2022, Isagenix entered into a Bulk Volume Purchase Agreement with Marshak and Marshak Enterprises LLC and also entered into a separate Bulk Volume Purchase Agreement with Well Nutrition, which was signed by Hopstein on behalf of Well Nutrition. The Bulk Volume Purchase Agreements provide that their terms include all the terms and prohibitions in the Isagenix Policies and Procedures.

29. Isagenix also required Hopstein to execute an Isagenix Independent Associate Application and Agreement and become an Associate because he had not previously been an Associate. On January 26, 2022, Hopstein entered into an Associate Contract with Isagenix by agreeing to the terms in the Isagenix Independent Associate Application and Agreement. In entering into the contract, Hopstein agreed to follow the Isagenix Rules and abide by all the terms in the Isagenix Policies & Procedures, among other terms.

30. In the following few months, Isagenix continued to be concerned that, despite their representations to the contrary, Defendants were in fact selling the products they were purchasing on Amazon or to Amazon.com. Inc. which in turn sold the products on Amazon. Through investigation, Isagenix discovered that Amazon.com, Inc. was selling a large quantity of Isagenix products on the Amazon website that was similar in product count and product type to the products Defendants had purchased from Isagenix.

31. Isagenix continued to question Marshak and Hopstein about their sales and Marshak and Hopstein continued to deny that the products they were purchasing were being resold on Amazon. For example, during a videoconference call on April 28, 2022, Hopstein repeatedly stated that all of the Isagenix products he purchased were exclusively sold to consumers through non-Internet transactions at juice and vitamin bars at stores in New York. Hopstein explained that he is a member of the Jewish community and has a large number of Jewish friends and customers who are interested in Isagenix products and who he manages through an email database. The participants on the April 28, 2022 call included Hopstein and Marshak as well as Isagenix employees Jason Ahlmann and Cassy Readatte and Isagenix CEO Sharon Walsh.

32. Marshak and Hopstein's repeated, affirmative representations that they were not selling Isagenix products on unauthorized websites or to third parties that resold the products on the Internet were material to Isagenix's decision to enter into Bulk Volume Purchase Agreements with Defendants and allow Marshak and Hopstein to retain their status as Associates and their right to purchase products from Isagenix. Isagenix would

8

not have entered into Associate Contracts or Bulk Volume Purchase Agreements with Defendants if it had known Defendants' representations were false.

33. Marshak and Hopstein's representations were, in fact, false. Through this lawsuit, Isagenix served a subpoena on Amazon.com, Inc. ("Amazon.com"), the operator of Amazon, seeking information about the identities of sellers who had sold Isagenix products to Amazon.com itself. In response to Isagenix's response, Amazon.com disclosed that Hopstein was the sole supplier of unauthorized Isagenix products to Amazon.com and Amazon.com subsequently resold the products on Amazon.

34. Marshak and Hopstein knew their representations were false and intended for Isagenix to believe their false representations. Hopstein directly sold Isagenix products to Amazon.com, and Marshak was well aware that his friend Hopstein was selling products to Amazon.com and making substantial profits that, upon information and belief, Marshak and Hopstein shared. Defendants have acted in concert as a part of a coordinated scheme to defraud Isagenix and breach the contracts they entered into with Isagenix by selling high volumes of Isagenix products to Amazon.com.

35. Isagenix did not know that Marshak and Hopstein's representations were false, relied on Marshak and Hopstein's representations and believed they were true, and had a right to rely on Marshak and Hopstein's representations. Isagenix reasonably believed that, after it questioned Marshak and Hopstein about their purchases, Marshak and Hopstein were telling the truth when they repeatedly assured Isagenix that the products they purchased were not being sold on the Internet and provided numerous details about the methods they supposedly used to sell the products through non-Internet transactions.

36. By selling products to Amazon.com, Defendants are in material breach of their contracts with Isagenix. Each Defendant's contract provides that Defendants are prohibited from selling Isagenix products to any third party "for the purpose of resale through the Internet or other electronic commerce channels." Sales to Amazon.com—as well as sales to Hopstein, to the extent products were sold to Hopstein before they sold to

Amazon.com—are sales to a third party that Defendants knew was going to resell the products through the Internet.

### Isagenix Has Suffered Substantial Harm

37. Isagenix has been harmed and suffered damages as a result of Defendants' breach of contract and fraud. By selling products to Amazon.com, Defendants caused a large volume of Isagenix products to be sold to consumers by an unauthorized seller that is outside of Isagenix's quality controls and over whom Isagenix cannot exercise quality control. These sales cause significant monetary harm to Isagenix including but not limited to loss of sales, harm to the goodwill associated with the Isagenix brand, and damage to Isagenix's existing and potential business relations.

38. Defendants also received substantial bonuses and commissions from Isagenix that they were not entitled to receive because the bonuses and commissions accrued from sales that were in breach of Defendants' contracts and the Isagenix Rules. Isagenix would not have paid commissions or bonuses if it had known the products Defendants purchased were being sold to Amazon.com, and Isagenix is entitled to recover the commissions and bonuses it paid under the Isagenix Rules. The collective total of these bonuses and commissions is in excess of $30,000.

39. Defendants' contracts with Isagenix also provide that Defendant must pay $500 to Isagenix for each unit of product they sold to Amazon.com. Monitoring software estimates that Amazon.com has sold more than 5,000 units of Isagenix products since Defendants began selling Isagenix products to Amazon.com. Isagenix is accordingly entitled to recover more than $2,500,000.00 from Defendants under the terms of the parties' contracts.

40. Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

41. Isagenix is entitled to injunctive relief because Defendants will otherwise continue to breach their contracts by selling Isagenix products to unauthorized resellers who Defendants knew would resell the products through unauthorized websites.

Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to the goodwill associated with the Isagenix brand and cause Isagenix and its Associates to lose business.

### FIRST CAUSE OF ACTION
### Breach of Contract

42. Isagenix re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

43. Defendants entered into valid and enforceable contracts with Isagenix and agreed to the terms set forth in the Isagenix Rules.

44. Specifically, Marshak entered into an Associate Contract with Isagenix on July 6, 2017, Hopstein entered into an Associate Contract with Isagenix on January 26, 2022, Marshak and Marshak Enterprises, LLC entered into a Bulk Volume Purchase Agreement with Isagenix on January 25, 2022, and Well Nutrition entered into a Bulk Volume Purchase Agreement with Isagenix on January 25, 2022.

45. Each of these contracts provides that their terms include all the terms in the Isagenix Policies and Procedures. Section 4.5 of the Isagenix Policies and Procedures provides that "no Associate (or Customer) may sell, offer, or otherwise provide Isagenix products to third parties for the purpose of resale through the Internet or other electronic commerce channels . . . . [i]f you know, or reasonably should have known, that products were sold to a third party for the purposes of resale through unauthorized channels, in addition to any other remedies hereunder or available by law, you agree to pay Isagenix five hundred United States dollars ($500.00) for each unit of Isagenix product in each instance of a prohibited, unauthorized, and/or noncompliant sale. You acknowledge and agree that a breach of such obligations will cause irreparable harm and damage to Isagenix and expressly waive any defense to Isagenix's claim to such liquidated damages on the

basis that actual damages are unascertainable or that such liquidated damages do not represent a reasonable determination of damages or penalties."

46.     Section 4.5 of the Isagenix Policies and Procedures also provides that Associates "may not (directly or through any intermediary or instrumentality) offer, display, or sell, or facilitate the offering, displaying or selling of Isagenix's products" through any website or other online medium except for personal "Associate websites" provided to Associates by Isagenix. This prohibition includes sales on online marketplaces such as Amazon. Section 4.5 provides further that "If you sell any Isagenix products through auction sales, on online auction sites, or through any other unauthorized website or channel, in addition to any other remedies hereunder or available by law, you agree to pay Isagenix five hundred United States dollars ($500.00) for each unit of Isagenix product in each instance of a prohibited, unauthorized, and/or noncompliant sale."

47.     Defendants' Bulk Volume Purchase Agreements also provide that Defendants are prohibited from "displaying, advertising, or selling Company products on any online auction sites (e.g., through eBay or Amazon)."

48.     Defendants have materially breached their contracts with Isagenix by selling Isagenix products to third parties—Amazon.com and Hopstein—that they knew would sell the products on Amazon or cause the products to be sold on Amazon.

49.     Isagenix fulfilled all of its obligations under its contracts with Defendants.

50.     All conditions required for Defendants' performance under Defendants' contracts with Isagenix have occurred.

51.     As a direct and proximate result of Defendants' material breaches of their contracts, Isagenix has suffered and will continue to suffer damages, including but not limited to loss of business, goodwill, reputation, and monetary damages.

52.     Pursuant to the contracts' terms, Isagenix is entitled to recover liquidated damages in the amount of $500 for each unit of Isagenix product that Defendants purchased from Isagenix and then sold to Hopstein and Amazon.com. Upon information and belief, Defendants have sold more than 5,000 Isagenix products to Amazon.com.

53. Defendants also received substantial bonuses and commissions from Isagenix that they were not entitled to receive because the bonuses and commissions accrued from sales that were in breach of Defendants' contracts and the Isagenix Rules. Isagenix would not have paid commissions or bonuses if it had known the products Defendants purchased were being sold to Amazon.com, and Isagenix is entitled to recover the commissions and bonuses it paid under the Isagenix Rules. The collective total of these bonuses and commissions is in excess of $30,000.

54. In harming Isagenix, Defendants acted with actual malice, willful misconduct, ill will, spite, and/or for the purpose of injuring Isagenix. Defendants' actions were done in reckless disregard for Isagenix's rights as those actions reflected complete indifference to Isagenix's rights. Defendants also acted with an evil mind because they intended to cause injury, were motivated by spite or ill will, acted to serve their own interest having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure the rights of Isagenix, and/or consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Isagenix. Accordingly, Isagenix is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION

### Common Law Fraud – Marshak and Hopstein

55. Isagenix re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

56. This claim arises under the common law of the State of Arizona.

57. Between September 2021 and April 2022, as discussed above, Marshak and Hopstein repeatedly represented that the Isagenix products they were purchasing from Isagenix were not being sold on Amazon or any website. Marshak and Hopstein represented that the products were instead being sold in a retail setting through non-Internet transactions and that they understood their contracts with Isagenix prohibited Defendants from selling Isagenix products on unauthorized websites or to any third party that resold the products on the Internet.

58. Marshak and Hopstein's representations were material to Isagenix's decision to enter into Bulk Volume Purchase Agreements with Defendants and allow Marshak and Hopstein to retain their status as Associates and their right to purchase products from Isagenix. Isagenix would not have entered into or maintained Associate Contracts or Bulk Volume Purchase Agreements with Defendants if it had known Marshak and Hopstein's representations were false.

59. Marshak and Hopstein's representations were, in fact, false. A vast quantity of Isagenix products that Defendants purchased from Isagenix were sold to Amazon.com, which resold the products on Amazon.

60. Marshak and Hopstein knew their representations were false and intended for Isagenix to believe their false representations. Hopstein directly sold Isagenix products to Amazon.com, and Marshak was well aware that his friend Hopstein was selling products to Amazon.com. Because they knew Amazon.com would resell the products on Amazon and thus that their sales to Amazon.com were in material breach of their contracts with Isagenix, Marshak and Hopstein knowingly, deliberately, and repeatedly lied to Isagenix about what they did with the products they purchased so they could continue to have access to Isagenix products. Marshak and Hopstein have acted in concert as a part of a coordinated scheme to defraud Isagenix and breach the contracts they entered into with Isagenix by selling high volumes of Isagenix products to Amazon.com.

61. Isagenix did not know that Marshak and Hopstein's representations were false, relied on Marshak and Hopstein's representations and believed they were true, and had a right to rely on Marshak and Hopstein's representations. Isagenix reasonably believed that, after it questioned Marshak and Hopstein about their purchases, Marshak and Hopstein were telling the truth when they repeatedly assured Isagenix that the products they purchased were not being sold on the Internet and provided numerous details about the methods they supposedly used to sell the products through non-Internet transactions.

62. Isagenix has been harmed and suffered damages as a result of Marshak and

Hopstein's fraud. By selling products to Amazon.com, Marshak and Hopstein caused a large volume of Isagenix products to be sold to consumers by an unauthorized seller that is outside of Isagenix's quality controls and over whom Isagenix cannot exercise quality control. These sales cause significant monetary harm to Isagenix including but not limited to loss of sales, harm to the goodwill associated with the Isagenix brand, and damage to Isagenix's existing and potential business relations.

63. Marshak and Hopstein also received substantial bonuses and commissions from Isagenix that they were not entitled to receive because the bonuses and commissions accrued from sales that were in breach of Marshak and Hopstein's contracts with Isagenix. Isagenix would not have paid commissions or bonuses if Marshak and Hopstein had told the truth about their sales and Marshak and Hopstein had known the products Defendants purchased were being sold to Amazon.com. Isagenix is entitled to recover the commissions and bonuses it paid to Marshak and Hopstein, and the collective total of these bonuses and commissions is in excess of $30,000.

64. In harming Isagenix, Marshak and Hopstein acted with actual malice, willful misconduct, ill will, spite, and/or for the purpose of injuring Isagenix. Marshak and Hopstein's actions were done in reckless disregard for Isagenix's rights as those actions reflected complete indifference to Isagenix's rights. Marshak and Hopstein also acted with an evil mind because they intended to cause injury, were motivated by spite or ill will, acted to serve their own interest having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure the rights of Isagenix, and/or consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Isagenix. Accordingly, Isagenix is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Isagenix prays for relief and judgment as follows:

A. Judgment in favor of Isagenix and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory

15

damages, treble damages, liquidated damages, restitution, reimbursement, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B. That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i) Prohibiting the Enjoined Parties from selling Isagenix products to any third party who the Enjoined Parties know, or have reason to know, intends to resell the products through the Internet;

ii) Prohibiting the Enjoined Parties from selling Isagenix products through any website or other medium except for personal "Associate websites" that have been provided to Defendants by Isagenix; and

iii) Requiring the Enjoined Parties to comply with all terms in the contracts they have entered into Isagenix;

C. An award of liquidated damages in the amount of $500 for each unit of Isagenix product that Defendants sold to Amazon.com. Inc. or to a third party that sold the products to Amazon.com, Inc.;

65. An award of attorneys' fees, costs, and expenses; and

66. Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

67. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Isagenix demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 21st day of July, 2022.

KERCSMAR FELTUS & COLLINS PLLC

By: *s/ Gregory B. Collins*
Gregory B. Collins
Daniel P. Crane
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251

Daniel C.F. Wucherer *(pro hac)*
VORYS, SATER, SEYMOUR AND PEASE LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, Ohio 45202
*Attorneys for Plaintiff*